FILED
07/14/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

**JARRETT A. JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-392      Steve R. Dozier, Judge**

_____

**No. M2019-01601-CCA-R3-PC**

_____

The Davidson County Grand Jury indicted Petitioner, Jarrett A. Jones, on one count of sexual exploitation of a minor (over 100 images) and thirty-four counts of especially aggravated sexual exploitation of a minor, all Class B felonies. Petitioner pled guilty as a Range I offender to one count of sexual exploitation of a minor (over 100 images) and two counts of especially aggravated sexual exploitation of a minor. All other counts were dismissed based upon his guilty plea. The trial court sentenced Petitioner, pursuant to the plea agreement, to eight years at 100% on each count and ordered the sentences to run consecutively, for a total effective sentence of twenty-four years' incarceration. Petitioner timely filed a pro se petition for post-conviction relief, and the post-conviction court appointed counsel, who filed an amended petition. After a hearing, the post-conviction court denied relief in a written order. On appeal, Petitioner argues that he was denied the effective assistance of counsel and that his guilty plea was not entered into knowingly, voluntarily, and intelligently. Following a thorough review, we affirm the judgment of the post-conviction court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Jarrett A Jones.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

*Guilty Plea Submission Hearing*

At Petitioner's guilty plea submission hearing, the State provided the following factual recitation as the basis for his plea:

> Had this matter gone to trial, the State's witnesses would testify that in beginning of September of 2016, [Petitioner], who at that point was a teacher at Antioch High School enlisted the help of a colleague to try and fix [Petitioner's] computer. While working on the computer, his colleague accessed the computer recycle bin and found a title -- a file that was entitled Nudist Junior Miss Pageant. The file did not contain images or videos but it just contained that.

> As the colleague continued to try to fix the computer, he noticed a video file on the computer desktop. He played that video. The video started by showing a male, [Petitioner], setting up a camera in what appeared to be a bathroom. Then showed a female who appeared to be a minor come into the room and start changing clothes. At that point, the colleague contacted the school's SRO who then notified Metro Police.

> Metro Police Detective, Michael Adkins who is with the Internet Crimes Against Children Unit responded, spoke to the colleague and recovered the computer in this matter. A search warrant for the computer was obtained that same day. It was turned over to Metro police detective Chad Gish, who was an expert in computer forensics. He examined and analyzed that computer. Detective Gish was able to locate the files that the colleague had indicated were there.

> Upon finding those files, Detective Adkins contacted the Metro school security and informed the head of that unit, Jimmy Wheeler, that [Petitioner], who had been an employee with Metro school since 2011 and was working as a substitute and then was given full-time status with the Metro school, had -- what they had found on this computer of this particular employee. It was learned that between 2011 and 2015, that [Petitioner] was an employee at Napier Elementary School here in Davidson County. August 1st, 2015, he transferred over to Antioch High School.

Detective Adkins went to Napier Elementary, spoke to the principal of that school who confirmed that [Petitioner] during that period of time did, in fact, work at Napier Elementary School. She was shown the videos that were found of the children. She recognized the location of those videos, which w[as] a closet inside that school. The detectives also were able to recover pictures from the -- several videos of minor girls on this computer. The principal was able to identify many of those children as former students. These pictures had been taken a few years ago, so those children were now in other schools within Metro schools.

Detective Gish continued to look at that computer and found other -- several hundred images of child pornography that did not involve these children in addition to the [fifty-three] pictures or videos that they found of the children that at the time were attending Napier Elementary School.

Detective Adkins went to Antioch High School, spoke to [Petitioner]. [Petitioner] did admit to secretly recording the videos of the students undressing during his tenure at Napier Elementary School.

At that point, he had said he only [made] ten of those videos; however, the computer forensics found [fifty-three]. He admitted to using a thumb drive recording device he would place in the closet prior to the students going in the closet and undressing. And he confessed that the thumb drive was still in his home. He further admitted to secretly recording others including his wife, his sister-in-law[,] and minor nieces. Those videos were made in another state and were unable to be dealt with in Tennessee. He admitted to downloading and looking at child pornography from the internet. He did admit he would have child pornography on an external drive which was in fact found.

On September 12th, 2016, Detective Gish gave his final report, which he indicated he found over [fifty] videos of minor students undressing in that classroom closet. They were in a folder entitled Napier Elementary and those children were in various stages of undress including some that were totally nude. There [was] a further analysis of other electronics found in the home including external hard drives, computers, memory cards, and more child pornography was found on those the devices.

The trial court conducted a plea colloquy with Petitioner. The court advised Petitioner of his rights, including his right to a trial by jury, his right to confront the

State's witnesses or to call witnesses, and his right to remain silent or to testify. The trial court also explained the State's burden of proof at trial and that there was no right to appeal from a guilty plea. The trial court detailed the charges against Petitioner and stated the minimum and maximum possible sentence for each charge. When asked by the court, Petitioner denied that he was under the influence of alcohol or drugs and denied that he was suffering from any mental health problems. Petitioner also denied that he was being forced to enter the guilty plea. At the conclusion of the hearing, the trial court found that there was a factual basis for the plea and that it was knowingly and voluntarily entered and sentenced Petitioner according to the plea agreement.

*Post-Conviction Hearing*

At a hearing on his post-conviction petition, Petitioner testified that trial counsel began representing him prior to his indictment. He said that trial counsel visited him in jail several times before the grand jury issued the indictment and that the visits were usually ten to fifteen minutes long. Petitioner stated that, after his arraignment, trial counsel met with him for fifteen to thirty minutes at a time before his discussion dates in criminal court. Petitioner estimated that he met with trial counsel between eight and ten times during the year and a half that trial counsel represented him.

Petitioner recalled that, during discussions with trial counsel, they talked about what would happen if Petitioner went to trial. Trial counsel related to Petitioner how the prosecutor said she was going to approach the trial. Trial counsel told Petitioner how the State would present the evidence and its witnesses, and trial counsel warned that "[i]t would be a media circus." Petitioner said that it was "very intimidating."

Petitioner stated that, after he was arrested and incarcerated, he was diagnosed with depression and anxiety and that doctors at the jail prescribed him medication to treat the conditions. Petitioner recalled that he took Celexa for depression and Remeron for anxiety, but he could not recall the dosage. When asked about the effects of the medication, Petitioner testified:

> I noticed after a while that nothing seemed to really bother me as much. Like, I wouldn't get as emotional about things. Because at first, I was obviously very emotional. My life was turned upside down and everything was just chaotic and then after they prescribed me the medication, I noticed that things just started to just mellow out but it was more in a way of I just didn't really have a feeling one way or the other about something. It was almost like -- I don't want to say I didn't care, but that's just how my demeanor was, I was very flat.

- 4 -

When asked how the medication affected his communication with trial counsel and his understanding of "what was going on in the case and things like that[,]" Petitioner responded, "Ultimately, I didn't understand the grand scope of things." He said that, after his guilty plea, he stopped taking the medications and his mind became clearer. He explained that he was able to "actually look and understand exactly what I was charged with compared to . . . the facts of the case[.]" Petitioner said that the doctors at the jail never asked if he wanted to stop taking the medication, and he never asked to be taken off them based on how they made him feel.

Petitioner denied that trial counsel explained to him what the State would have to prove to convict him of especially aggravated sexual exploitation of a minor in counts two through thirty-five. He said, however, that prior to being placed on medication and prior to his plea, he read the especially aggravated sexual exploitation of a minor statute and told trial counsel that he did not believe what he did constituted especially aggravated sexual exploitation of a minor. According to Petitioner, trial counsel responded that he would "look into it." Petitioner did not recall talking to trial counsel about the meaning of the word "lascivious," which appeared in the statute. Petitioner said that, after his plea, he looked up the definition of lascivious and found that the definition was "very vague as well, very broad." He stated that, once transferred to the Department of Correction, he familiarized himself with case law surrounding the especially aggravated sexual exploitation of a minor statute. He said that trial counsel never discussed any Tennessee case law relating to the statute.

Petitioner recalled that trial counsel discussed his possible sentence if the case went to trial and that trial counsel advised him it was going to be "very bad." Trial counsel explained to Petitioner that his sentence could be essentially a life sentence, if the trial court imposed consecutive sentencing. Petitioner testified, "[T]here was no defense. There was no, well, we could do this, we could do that, it was just this is what I believe is going to happen." Petitioner stated that, if he had known about the case law on the especially aggravated sexual exploitation of a minor statute and that he had a defense based on the cases, he would have gone to trial. Petitioner testified that, based on the content of the videos he created, he believed that a jury would conclude they were not lascivious. Petitioner recalled that he and trial counsel discussed unlawful photography as being an appropriate charge based on his conduct. Trial counsel discussed the unlawful photography with the prosecutor, but she "came back saying no."

On cross-examination, Petitioner acknowledged that the charge in count one of the indictment, sexual exploitation of a minor, was based on over 100 images of child pornography that he downloaded from the internet. Petitioner admitted that he set up the camera used to videotape the children in the closet. He explained that the closet was attached to his classroom and the music room at the school and that the closet was

- 5 -

designated as a changing room for the school play because his classroom "joined up to the stage[.]" When asked why he had recorded the children changing clothes, Petitioner said that it was "just an impulsive thing to do at the time." Petitioner acknowledged that he watched the videotapes after making the recordings "[j]ust to see them." Petitioner stated that he recorded children inside the closet over the course of two years. Petitioner acknowledged that he had a folder on his computer entitled "Napier" that contained videos named for each child that he had recorded. Petitioner said that the videos of his family members were taken after the videos of the children at his school. He claimed that he had not seen the videos provided by the State in discovery.

Petitioner acknowledged that the definition of "sexual activity" in the especially aggravated sexual exploitation of a minor statute, included "lascivious exhibition of the female breast or the genitals or pubic area of any person[.]" Petitioner stated that, in his research, he found several cases in which convictions were overturned because the defendants' acts did not "fit . . . sexual activity because they d[id] not go anything beyond mere nudity[.]" Petitioner agreed that he told trial counsel during their discussions that he did not believe he violated the statute, and he said that he was an active participant in his case "[f]rom the very beginning[.]"

Petitioner agreed that trial counsel discussed the possible maximum sentence he could receive. He recalled that the State's first plea offer was for a forty-year sentence. Regarding his plea colloquy, Petitioner explained that he "said what [he] thought was needed to be said in order to go through a plea deal" but stated that he did not really understand what would happen after his guilty plea.

On redirect, Petitioner stated that the children he recorded were changing into costumes for play performances, choir, or musicals to see if the costumes fit. He said that it was not his idea to have the children change into costumes or to have them do so in the closet attached to his classroom.

Trial counsel testified that he had practiced criminal law for twenty-eight years. He stated that he began representing Petitioner after Petitioner's arrest but before the grand jury's indictment. During his representation of Petitioner, trial counsel was assisted by associate counsel, who practiced in trial counsel's office. Trial counsel testified, however, that all legal decisions and trial tactics were determined between himself and Petitioner.

Regarding Petitioner's mental health at the time of the guilty plea, trial counsel explained:

- 6 -

> I was not aware of any mental health issues that prevented [Petitioner] from interacting with me. I think it's pretty obvious [Petitioner] was depressed and upset like he probably should have been.

Trial counsel stated that he talked to Petitioner about Petitioner's anxiety and depression and about the fact that Petitioner received medication. Petitioner never indicated that he "couldn't go forward or interact with [trial counsel]." Petitioner never indicated that he did not understand what was happening or that he could not understand the discussions with trial counsel. Trial counsel said that he never sought a psychiatric assessment of Petitioner because "[i]t never got to the point where [he] felt like [Petitioner] could not assist [counsel] or understand his defense." Rather, trial counsel explained that Petitioner became "resigned" to the fact that he was facing serious charges.

Trial counsel recalled that he met with Petitioner both at court and at the jail. He estimated that he met with Petitioner ten to twelve times at the jail for about thirty to forty minutes at a time. Trial counsel stated that he and Petitioner discussed, in detail, alternate charges and whether Petitioner's conduct constituted a violation of the especially aggravated sexual exploitation of a minor statute. Trial counsel testified:

> And lot of times the discussions were in [l]ayman's terms. . . . [Y]ou know, as far as going over *Whited* and *Grisham* and reading the case law and, you know, really having him read and study, I didn't do that. I have those cases in my file. I reviewed those when we were going through the case.
>
> . . . .
>
> And at the end of the day, the bottom line question came whether or not it was lascivious or not. Okay? Because even early on [Petitioner] said [he] just sat up a camera and they dressed or undressed in front of the camera. And I remember talking with [the prosecutor] . . . from the get go about, you know, hey, is this possibly unlawful photography or, you know, just pictures without any sexualization or sexual poses or any of the things that are the criteria that you're talking about in [the aggravated sexual exploitation of a minor statute]. Of course, you know, the State's response . . . was well, just wait until you get discovery. It's more than just, you know, a camera and pictures being made. And so we had to go through a process where we talked about elements what it could or may not be.

Trial counsel stated that he discussed with Petitioner "what the State would have to show" and that the key issue was whether the State would be able to establish that the videos amounted to "lascivious exhibition."

Trial counsel testified that he reviewed discovery with Petitioner, and they viewed each of the videos at the prosecutor's office. Regarding the contents of the videos, trial counsel recalled:

> But the videos in discovery are detailed about how they occurred at school and in a school setting, in the closet that was adjacent to his room. And the problem and the concerns that I had was that it was orchestrated and there were times when [Petitioner] guided and positioned, interacted with the girls and, you know, nude photography or nude shots were then gained in the closet on multiple occasions.
>
> . . . .
>
> [O]nce we got discovery, it was obvious that there was quite a bit of nudity on different occasions and you heard through discovery, a large number of young girls. And his voice is on it, [Petitioner's] directing them. And in different occasions he's actually telling girls to go back in, pulling the, you know, the training bra strap and guiding them back in, saying . . . it all has to come off. After seeing that, I was very concerned. You know, and what you got to the look as at an attorney is one, you know, the trier of fact being a jury, what they would consider as lascivious and what I found out in case law is that it's . . . intensely fact bound on each case.
>
> . . . .
>
> But there were a number of [the videos] where . . . there were some real manipulation where [Petitioner] told them to move up, move forward, get in a better position. Those are real problematic. And there are quite a few of those[,] don't remember the exact number. But also the general premise that you know, he's a teacher, they were at school. You know, they can go home and change and see if they fit, let their mom bring them back. I knew that would be coming in later in front of the jury. And at trial, the State would be going there is no rule that says you've got to try on uniforms, you know, directed by a male in the closet adjacent to the room. The fact that it was set up and done at a school setting by a teacher, is again, problematic.

Trial counsel said that he discussed with Petitioner some factors that would support a claim that the videos were not lascivious, but he stressed that "some other factors . . . would be real problematic," both at trial and at sentencing. Trial counsel explained that he was concerned that the trial court would impose consecutive sentences based upon Petitioner's recording of his niece and "some other matters" contained in discovery. Trial counsel noted that the definition of "lascivious" was "broad and vague." Trial counsel said that Petitioner never told him that there was a school rule that children had to change in the closet where Petitioner set up his camera.

Trial counsel stated that he had multiple discussions with Petitioner prior to his plea about "what the possibilities could be if he got convicted" on all charges. He recalled that the State's initial offer was for Petitioner to serve forty years; however, he was able to convince the prosecutor that it would be better for the children not to testify at trial. Trial counsel recalled that he discussed the case multiple times with the prosecutor and argued that the children did not know they had been recorded until years later. He argued mitigating factors to the prosecutor, including that Petitioner had no prior record, that Petitioner was an accomplished musician, and that he was married and came from a good family. Trial counsel also tried to convince the prosecutor that Petitioner's actions were "something lesser than aggravated sexual exploitation of a minor[.]" Trial counsel said he was concerned that, even if Petitioner were convicted of lesser-included offenses, Petitioner "was still looking at a long time of consecutive sentencing based on what was found in his computer and his prior behavior." He recalled that the prosecutor eventually reduced the plea offer to twenty-four years' incarceration. Trial counsel said that he felt strongly that twenty-four years was "a safe and proper disposition" of Petitioner's charges.

Trial counsel stated that he met with Petitioner the day before his guilty plea and "went over the plea and . . . what the final offer was." Trial counsel testified that he believed Petitioner understood the plea petition and understood what he was doing at the guilty plea submission hearing.

At the conclusion of trial counsel's testimony, the State entered a copy of the transcript of the guilty plea submission hearing and placed under seal, as an exhibit, a copy of some of the videos from Napier Elementary School made by Petitioner. The post-conviction court took the matter under advisement and subsequently entered a written order denying relief.

Regarding Petitioner's claim of ineffective assistance of counsel based on trial counsel's failure to properly advise Petitioner about possible defenses to the charge of especially aggravated sexual exploitation of a minor, the post-conviction court found that counsel's performance was not deficient. The post-conviction court reasoned:

[Trial counsel] is an attorney who has maintained a criminal defense practice since 1991 and has handled hundreds, if not thousands, of criminal cases. [Trial counsel] had numerous discussions with the State which produced several offers and counter-offers during the course of the plea negotiations. With all due respect to [Petitioner], the Court accredits [trial counsel's] testimony that [trial counsel] had multiple conversations in layman['s] terms with [Petitioner] about the specific statute [Petitioner] allegedly violated, the possible length of the potential sentence, and whether or not the images the State produced during discovery would be considered lascivious. Furthermore, the Court accredits [trial counsel's] testimony that these conversations were informed by his understanding of the case law surrounding the definition of lascivious and his opinion that the videos "orchestrated" and "produced" by [Petitioner] were likely to be found by a jury to be lascivious. Without going into an in-depth analysis of the lasciviousness of each video, the Court finds that [trial counsel's] assessment of the State's case was reasonable and well within the range of competence required.

The Court also finds that [trial counsel] informed [Petitioner] that he was highly concerned about the potential for consecutive sentencing given [Petitioner's] position of power, and that [trial counsel's] concern was reasonable. Accordingly, the Court finds that [trial counsel's] representation of [Petitioner] was not deficient. Thus, the Court finds [Petitioner] is not entitled to relief on this ground.

Regarding Petitioner's claim that trial counsel failed to ensure that he was fully aware of the ramifications of his plea due to Petitioner's psychological medication resulting in an unknowing guilty plea, the post-conviction court concluded that Petitioner's plea was entered into knowingly and voluntarily. The post-conviction court found:

After considering the testimony and evidence offered at the instant hearing, the Court does not find any merit to [Petitioner's] contention that the guilty plea was not entered into knowingly, voluntarily, and intelligently. [Petitioner] claims that he was medicated at the time of the plea and that these medications had detrimental effects on his ability to make rational and informed decisions about entering his plea. However, the Court accredits the testimony of [trial counsel] over that of [Petitioner] in this matter. The Court fully accredits [trial counsel's] testimony that he believed [Petitioner] understood the plea petition and the event of pleading.

[Trial counsel] testified that although he was aware of [Petitioner's] anxiety and depression, he did not think this prevented him from knowingly entering the plea. [Petitioner] did acknowledge during the plea colloquy that he was not under the influence of any alcohol or drugs, nor suffering from any mental health problems. Ultimately, while [Petitioner] clearly was not pleased and perhaps was resigned as to the disposition of his case, the Court still finds that the proof establishes by clear and convincing evidence that [Petitioner's] plea was entered into knowingly and voluntarily. Accordingly, [Petitioner] is not entitled to relief on this ground.

This timely appeal follows.

## Analysis

On appeal, Petitioner asserts that he received ineffective assistance of counsel because trial counsel failed to advise Petitioner of "the relevant case law and interpretation of language in his conviction offense so as to permit a knowing waiver of his right to trial" and failed to ensure that Petitioner was "fully aware of the ramifications of his plea" while taking medication for depression and anxiety.

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764,

at *4 (Tenn. Ct. Crim. App. April 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

### *Failure to Advise Petitioner of Relevant Case Law*

Petitioner contends that he received ineffective assistance of counsel based on trial counsel's failure "to advise [Petitioner] of the relevant case law and interpretation of language" pertaining to his charges of especially aggravated sexual exploitation of a minor "so as to permit a knowing waiver of his right to trial." He argues that the videos he created do not meet the definition of "lascivious exhibition" of private areas of the body under *State v. Whited*, 506 S.W. 3d 416 (Tenn. 2016), and *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986).[1] Rather, he asserts that the videos depict "mere nudity of the minors," which is insufficient to support convictions for especially aggravated sexual exploitation of a minor. Petitioner asserts that, had trial counsel adequately advised him based on *Whited*, he would not have entered his guilty plea and would have proceeded to trial, during which he would have premised his defense on the assertion that the State did not have sufficient evidence to establish the element of lascivious exhibition.

As relevant to the charges of especially aggravated sexual exploitation of a minor in counts two through thirty-five of the indictment, Tennessee Code Annotated section 39-17-1005 provides:

> It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in:
>
> (1) Sexual activity; or
>
> (2) Simulated sexual activity that is patently offensive.

---

[1] Petitioner additionally cites to *State v. David Scott Hall*, --- S.W.3d ---, 2019 WL 117580 M2015-02402-SC-R11-CD, at *1 (Tenn. Jan. 7, 2019), but acknowledges that the case was decided after the entry of his guilty plea and, thus, trial counsel could not have discussed the case with him.

Tenn. Code Ann. § 39-17-1005(a) (2016). "Sexual activity" includes the "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." Tenn. Code Ann. § 39-17-1002(8)(G) (2016).

In *Whited*, the Tennessee Supreme Court addressed whether hidden-camera videos depicted minors engaging in a "lascivious exhibition" within the meaning of Tennessee Code Annotated section 39-17-1002(8)(G). *Whited*, 506 S.W. 3d at 419. The defendant in that case secretly recorded minors doing ordinary, daily activities such as entering and exiting the shower, using a towel to dry off, changing clothes, and self-grooming. *Id*. at 442. The videos recorded by the defendant "depict[ed] nudity of a minor or minors to varying degrees," but the camera never focused exclusively on the minors' private areas. *Id*. Moreover, "nothing in the videos indicate[d] that the victims were posed or coached; they [were] not in any unnatural or overtly sexual poses and appear[ed] unaware of the camera." *Id*. at 446. The supreme court found the "question [to be] close" but held that the videos of the minors did not rise to the level of "lascivious exhibition." *Id*. at 447. In reaching this conclusion, the supreme court stated that "determining whether certain material depicts a minor engaging in the lascivious exhibition of their private body areas within the meaning of the sexual exploitation statutes is . . . 'an intensely fact-bound question.'" *Id*. at 431 (quoting *United States v. Schuster*, 706 F.3d 800, 806 (7th Cir. 2013)). The court observed that the term "lascivious" meant "tending to [incite] lust; lewd; indecent; obscene" and noted that it had a "sexual connotation." *Id*. at 430 (citations omitted). It further noted that, with regard to the "lasciviousness" determination, "the language chosen by the General Assembly [in the child exploitation statutes] [did] not include any reference to the defendant's subjective purpose of sexual arousal or gratification." *Id*. at 439. Rather, the determination of whether material depicts a minor engaging in lascivious exhibition of their private body areas should be based on an objective consideration of the features of the material. *Id*. The court stated that "mere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas." *Id*. at 431. However, nudity combined with other factors—such as the nature of the nudity depicted, emphasis or focus on private body areas, posing or coaching of the minor by the defendant, sound effects or commentary, or the defendant's presence in the depiction in a way that suggests a voyeuristic perspective—could be sufficient to make the depiction a lascivious exhibition. *Id*. at 447.

In *Dost*, the United States District Court for the Southern District of California held that, in determining whether a visual depiction of a minor constituted a "lascivious exhibition of the genitals or pubic area" under a federal statute, the trier of fact should look to a set of six factors. *Dost*, 636 F. Supp. at 832. The factors set out by the district court in *Dost* were discussed by the Tennessee Supreme Court in *Whited*, but the supreme court ultimately rejected the *Dost* factors as a test or analytical framework for

determining whether material is prohibited under Tennessee's child sexual exploitation statutes. *Whited,* 506 S.W. 3d at 438.

Initially, we note that much of Petitioner's argument on appeal is focused on his assertion that the videos he created depict "mere nudity of the minors" and, therefore, would not support convictions for especially aggravated sexual exploitation of a minor. However, when Petitioner accepted the plea agreement and entered a plea of guilty, he waived both his right to force the State to prove he was guilty and his right to appeal a guilty verdict. It is well-settled that a petitioner may not litigate his guilt or innocence in a post-conviction proceeding. *See Workman v. State*, 868 S.W.2d 705, 711 (Tenn. Crim. App. 1993). Accordingly, to the extent Petitioner is arguing that there was insufficient evidence to sustain his convictions for especially aggravated sexual exploitation of a minor, we conclude that he has waived the issue, and it is not a proper issue for a post-conviction proceeding. *See e.g., Reese L. Smith v. State*, No. M2005-00402-CCA-R3-PC, 2006 WL 643545, at *5 (Tenn. Crim. App. Mar. 10, 2006).

Regarding Petitioner's claim of ineffective assistance of counsel, trial counsel testified that he had practiced criminal law for twenty-eight years. He said that, prior to Petitioner's plea, he met with Petitioner ten to twelve times at the jail for about thirty to forty minutes at a time. Trial counsel stated that he discussed with Petitioner the potential for essentially a life sentence if Petitioner were convicted on all counts at trial. Trial counsel testified that he and Petitioner discussed, in detail, alternate charges and whether Petitioner's conduct constituted a violation of the especially aggravated sexual exploitation of a minor statute. He said that he reviewed the elements of the statute with Petitioner and explained that the key issue was whether the videos were lascivious. Trial counsel testified that, although he spoke in "[l]ayman's terms" with Petitioner, he reviewed the *Whited* opinion and that a copy of it was in his file. Trial counsel explained that he believed the facts of Petitioner's case were worse than in *Whited* and advised Petitioner accordingly. Trial counsel testified that he reviewed discovery with Petitioner, and they viewed each of the videos at the prosecutor's office. Regarding the contents of the videos, trial counsel explained, "[T]he problem and the concerns that I had was that it was orchestrated and there were times when [Petitioner] guided and positioned, interacted with the girls and, you know, nude photography or nude shots were then gained in the closet on multiple occasions."

In denying relief, the post-conviction court accredited trial counsel's testimony over that of Petitioner's and found that trial counsel had multiple conversations in layman's terms with Petitioner about the specific statute Petitioner allegedly violated, the possible length of the potential sentence, and whether or not the videos the State produced during discovery would be considered lascivious. The post-conviction court found that trial counsel's conversations with Petitioner were informed by "trial counsel's

- 15 -

understanding of the case law surrounding the definition of lascivious and his opinion that the videos 'orchestrated' and 'produced' by [Petitioner] were likely to be found by a jury to be lascivious." Following a review of some of the videos included in the State's exhibit, we agree with the post-conviction court that trial counsel's assessment of the State's case was reasonable, and it was well within the range of competence required for trial counsel to advise Petitioner to accept the plea offer, especially with thirty-four counts and the possibility of consecutive sentencing had Petitioner been convicted at trial. Petitioner has failed to establish deficient performance based on this claim, and he is not entitled to relief.

### *Failure to Ensure that Petitioner Understood the Guilty Plea*

Petitioner also asserts that he received ineffective assistance of counsel based on trial counsel's failure to ensure that Petitioner was "fully aware of the ramifications of his plea due to [Petitioner's] psychological medication."

At the post-conviction hearing, Petitioner testified that, after he was arrested and incarcerated, he was diagnosed with depression and anxiety and that doctors at the jail prescribed him medication to treat the conditions. Petitioner stated that the medication caused him to become less emotional and to have a "flat" demeanor. He testified, however, that he never asked to be taken off the medication based on how it made him feel. When asked how the medication affected his communication with trial counsel and his understanding of what trial counsel explained to him, Petitioner said that he "didn't understand the grand scope of things" or what would happen after his guilty plea.

Trial counsel, however, testified that he talked to Petitioner about Petitioner's anxiety and depression and about the fact that Petitioner received medication. Trial counsel said that Petitioner never indicated that he "couldn't go forward or interact with [trial counsel]." Moreover, Petitioner never indicated that he did not understand what was happening or that he could not understand the discussions with trial counsel. Trial counsel said that he did not seek a psychiatric assessment of Petitioner because "[i]t never got to the point where [he] felt like [Petitioner] could not assist [counsel] or understand his defense." Rather, trial counsel explained that Petitioner became "resigned" to the fact that he was facing serious charges. Trial counsel stated that he met with Petitioner the day before his guilty plea and "went over the plea and . . . what the final offer was." Trial counsel testified that he believed Petitioner understood the plea petition and understood what he was doing at the guilty plea submission hearing.

In finding that this issue was without merit, the post-conviction court accredited the testimony of trial counsel that Petitioner understood the plea petition and the event of pleading despite his taking medication for depression and anxiety. As noted by the post-

- 16 -

conviction court, trial counsel was aware of Petitioner's anxiety and depression, but trial counsel did not think that this prevented Petitioner from knowingly entering the plea. During his plea colloquy, Petitioner testified that he was not under the influence of alcohol or drugs or suffering from any mental health problems, and statements made in open court carry a strong presumption of truth. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). To overcome such a presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." *Id.* Based on the foregoing, we conclude that Petitioner has failed to establish deficient performance or resulting prejudice based on his claim that trial counsel failed to ensure that Petitioner was "fully aware of the ramifications of his plea due to [Petitioner's] psychological medication."

*Unknowing Guilty Plea*

Although it is unclear from Petitioner's brief if he intends to raise a stand-alone claim that his guilty plea was not knowingly and voluntarily entered, we will briefly address the issue. Whether a guilty plea is knowing and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact de novo with a presumption of correctness. *Id.* The post-conviction court's findings of law are reviewed purely de novo. *Id.*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers*, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e.[,] that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[ ] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel

and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244. Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge*, 431 U.S. at 73-74.

It is clear from both the plea colloquy and the post-conviction court's findings of fact that Petitioner made a knowing plea. During Petitioner's guilty plea submission hearing, the trial court explained the charges against Petitioner and the possible sentences stemming from it. The trial court also explained the State's burden of proof at trial and that there was no right to appeal from a guilty plea. When asked by the court, Petitioner denied that he was under the influence of alcohol or drugs and denied that he was suffering from any mental health problems. Petitioner also denied that he was being forced to enter the guilty plea. Petitioner acknowledged that he understood his rights and that he was waiving his right to a jury trial and his right to an appeal. Such statements made in open court carry a strong presumption of truth, and Petitioner has offered nothing to indicate that his plea was unknowing except to say that, at the time, he did not understand. Petitioner had the opportunity to confer with competent counsel about the options available to him, and by entering his plea, Petitioner avoided a potentially greater penalty that might have resulted from a jury trial. The post-conviction court determined that Petitioner did not prove by clear and convincing evidence that his plea was unknowing, and we agree. Therefore, Petitioner is not entitled to relief.

## Conclusion

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE